FILED

07/30/2020

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 15, 2020

## KENNETH C. MILLER v. MICHAEL KENNETH MILLER ET AL.

**Appeal from the Chancery Court for Carter County**
**No. 30105     John C. Rambo, Chancellor**

_____

### No. E2019-01511-COA-R3-CV

_____

In this declaratory judgment action, the plaintiff filed a complaint in the Carter County Chancery Court ("trial court") seeking an easement over improved real property located in Carter County. The plaintiff and his wife had originally conveyed the servient estate primarily at issue to the co-defendants, their son and daughter-in-law, in 2010. Following the 2010 conveyance, the plaintiff and his wife retained ownership of two adjoining parcels of land, which included their residence and were separated from the servient estate by an adjoining tract of real property that was owned by a third co-defendant, their great niece. The plaintiff and his wife also owned an "island" tract, consisting of approximately 18.4 acres of unimproved real property surrounded by the waters of the Watauga River and connected to the servient estate by a bridge that the plaintiff had built in the 1980s. The plaintiff's wife died in 2014. In April 2018, the plaintiff filed a complaint seeking declaratory judgment that a permanent easement appurtenant existed, either by prior use, estoppel, or necessity, for the island tract, as the dominant estate, across the great niece's property and the servient estate. Alternatively, the plaintiff claimed that he was entitled to an easement for ingress and egress, pursuant to Tennessee Code Annotated § 54-14-101 *et seq.* (2008), because the island tract was essentially "landlocked" by the servient estate. Following a bench trial, the trial court found that no permanent easement existed. Noting that the great niece had filed no responsive pleading and had not appeared for trial despite having received notice, the trial court entered a default judgment against her as to all issues that may have been raised concerning her interests. Upon further finding that the plaintiff was entitled to an easement by necessity, the trial court granted a twelve-foot easement to the plaintiff around the perimeter of the servient estate and across the great niece's property for ingress and egress to the bridge leading to the island tract. The trial court denied the plaintiff's request to locate the easement through the front yard of the servient estate. The great niece subsequently filed motions to alter or amend the final judgment and set aside the default judgment against her, both of which the trial court denied following a hearing. The plaintiff and the great niece have appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J., joined. RICHARD H. DINKINS, J., not participating.

Lois B. Shults-Davis, Erwin, Tennessee, for the appellants, Kenneth C. Miller and Lili Snyder.

John Banks, Elizabethton, Tennessee, for the appellees, Michael Kenneth Miller and Tammy Ruth Miller.

**OPINION**

I. Factual and Procedural Background

The tracts of real property at issue in this action originated as part of a family farm acquired in 1945 by Rufus "R.G." Cress and his wife, Mollie Cress, the grandparents of the plaintiff, Kenneth C. Miller ("Kenneth Miller"). The primary property over which Kenneth Miller[1] seeks an easement is an approximately 3.2-acre tract of improved real property located at 314 Lincoln Drive in Elizabethton, Tennessee ("the Servient Estate"). Kenneth Miller and his late wife, Mary June Miller, obtained fee simple title to the Servient Estate via warranty deed in 1959 from Loretta Miller, who was Kenneth Miller's mother and had owned the Servient Estate with her late husband, Lattie Miller. Kenneth Miller had constructed a home on the Servient Estate in 1972 as a residence for his parents. Kenneth and Mary June Miller subsequently conveyed the Servient Estate to a revocable living trust in their names. On February 4, 2010, Kenneth and Mary June Miller conveyed the Servient Estate via quitclaim deed from the revocable living trust to the co-defendants, their son, Michael Kenneth Miller ("Michael Miller"), and his wife, Tammy Ruth Miller ("Tammy Miller"). The conveyance was recorded with the Carter County register of deeds on February 8, 2010.

In a previous action filed in February 2016, Kenneth Miller and his four daughters, Pamela Ann Miller, Susan Miller Gibson, Donna Miller Taylor, and Julie Miller Beale, sought declaratory judgment against Michael and Tammy Miller, asserting that the February 2010 quitclaim deed conveying the Servient Estate was invalid. The 2016 complaint, included in the record in the instant action as an attachment to a responsive pleading, made no mention of an easement. In an order entered on September 14, 2017,

---

[1] Because several of the individuals involved in this lawsuit share a surname, we will at times refer to individuals by their first and last names for ease of reference and clarity. No disrespect is intended.

the trial court granted summary judgment in favor of Michael and Tammy Miller in the previous case, dismissing the action and determining that Michael and Tammy Miller were "declared to have and hold all the right, title and interest in and to the subject property, which is located at 314 Lincoln Drive, Elizabethton . . . ." Pursuant to Tennessee Rule of Civil Procedure 54.02, the trial court also declared the September 2017 order to be a final judgment, stating that the order "adjudicate[d] all issues which were raised or might have been raised between the parties." Kenneth Miller and his daughters did not appeal that decision.[2]

The property for which Kenneth Miller seeks the benefit of an easement is an approximately 18.4-acre tract of real property surrounded on all sides by the waters of the Watauga River and now improved by a small cabin ("Island Tract"). Fee simple title to the Island Tract was conveyed via warranty deed to Kenneth and Mary June Miller in May 1975 by Lattie and Loretta Miller and was duly recorded. Kenneth and Mary June Miller subsequently conveyed the Island Tract to their revocable living trust. Following his wife's death in 2014, Kenneth Miller, as the sole trustee, conveyed the Island Tract from the trust to himself as an individual in 2017. Kenneth Miller testified at trial that after obtaining permits and materials for construction of the bridge that connects the Servient Estate to the Island Tract, he completed the bridge's construction in 1987. Sam Beale, Kenneth Miller's son-in-law, testified that with Kenneth Miller's permission, he oversaw the construction of a "16-by-16 cabin" on the Island Tract, completing the project in 2012 for the enjoyment of the entire family.

The property for which Kenneth Miller seeks access to the Island Tract consists of two adjoining tracts of improved real property held by him in fee simple title, located at 300 Lincoln Drive, upon which his residence is situated, and 304 Lincoln Drive (collectively, "the Kenneth Miller Tracts"). Fee simple title to 300 Lincoln Drive was conveyed via warranty deed to Kenneth and Mary June Miller in January 1959 by Kenneth Miller's grandmother, Mollie Cress, and was duly recorded. Fee simple title to 304 Lincoln Drive was conveyed via warranty deed to Kenneth and Mary June Miller in April 1993 from Cynthia Wenzel Wilson and Glenna Wenzel Hardin and was also duly recorded. Kenneth and Mary June Miller subsequently conveyed both of these tracts to the revocable living trust in their names. As with the Island Tract, Kenneth Miller conveyed the Kenneth Miller Tracts to himself as an individual in 2017 contemporaneously with his revocation of the trust.

---

[2] On appeal, Kenneth Miller and Lili Snyder assert that the previous action, filed in 2016, is irrelevant to the instant action. Inasmuch as the procedural history of the instant action includes motions in which Michael and Tammy Miller argued *res judicata* based on the 2016 action and the 2016 complaint questioned the chain of title to the Servient Estate, we will describe in this opinion the factual and procedural history of the 2016 action as we find it relevant to the instant action.

In addition to crossing the Servient Estate, the easement, whether as awarded by the trial court or as sought by Kenneth Miller, also crosses a tract of real property located at 306 Lincoln Drive. Titled in fee simple interest to the third co-defendant, Lili Snyder, Kenneth Miller's great niece, this tract ("the Snyder Tract") adjoins the Kenneth Miller Tracts.[3] Ms. Snyder inherited her interest in the Snyder Tract from her father, David Allen Snyder, who had acquired fee simple title via warranty deed conveyed to him by his mother, Lois Snyder, in July 2008. That deed was also duly recorded.

On April 2, 2018, Kenneth Miller initiated the instant action by filing a complaint in the trial court, naming as defendants Michael Miller, Tammy Miller, and Lili Snyder, and seeking "immediate and permanent relief in regard to the denial of his continued access" to the Island Tract. Kenneth Miller asserted in the complaint:

> [Kenneth Miller], his predecessors in title and multiple lessees for more than seventy years have continuously accessed the Island Tract for purposes of farming and recreation by utilizing the county road known as Lincoln Drive and continuing after the end of the asphalt surface across the Kenneth Miller Tracts, the Snyder Tract, and the [Servient Estate].

He also asserted that he had "no alternative means of access to the Island Tract as it is completely surrounded by the waters of the Watauga River." Averring that Lili Snyder did "not oppose the continued access through her property," Kenneth Miller alleged that the actions of Michael and Tammy Miller had rendered him "unable to continue the full utilization and enjoyment of the Island Tract he [had] owned and enjoyed for over 40 years." Lili Snyder filed no responsive pleadings prior to trial and did not appear during the trial.

In his complaint, Kenneth Miller sought a declaration that a permanent implied easement appurtenant existed across the Servient Estate and the Snyder Tract for ingress to and egress from the Island Tract either by prior use, estoppel, or necessity. In the alternative, he requested that the trial court grant him an easement for ingress and egress, pursuant to what was then Tennessee Code Annotated § 54-14-101 (2008) *et seq.*, because the Island Tract was "essentially landlocked" by the Servient Estate and the Snyder Tract.[4]

---

[3] Although not entirely clear from the record, the Snyder Tract appears to be unimproved.

[4] Effective June 22, 2020, the General Assembly has amended the relevant statutory scheme to repeal Tennessee Code Annotated § 54-14-101 in its entirety; amend Tennessee Code Annotated §§ 54-14-102, 54-14-111, and 54-14-113; and enact a new § 54-14-119. *See* 2020 Tenn. Pub. Acts, Ch. 703, §§ 1-6 (H.B. 1914). Inasmuch as this action was filed prior to the effective date of the amendments, the previous version of the statute is applicable.

Kenneth Miller also requested permanent marking of the easement "so it may be referenced in the chain of title to the properties of the parties and their heirs, successors and assigns forever," as well as permission for himself, his heirs, successors, and assigns to enter the Servient Estate and the Snyder Tract to maintain the easement "now and forever." Kenneth Miller further requested that the trial court issue an order or injunction to prevent Michael and Tammy Miller from blocking his and his invitees' access to the Island Tract during the pendency of this action.

On May 18, 2018, Michael and Tammy Miller filed a motion to dismiss, pursuant to Tennessee Rule of Civil Procedure 12.02(6), asserting on the basis of *res judicata* that Kenneth Miller had failed to state a claim upon which relief could be granted. They argued that Kenneth Miller's easement claim had been litigated or could have been litigated in the previous case, noting the trial court's directive in its September 2017 order dismissing the previous action that such dismissal was with prejudice as to "all issues which were raised or might have been raised between the parties." Kenneth Miller filed a response to the motion to dismiss, asserting that *res judicata* was inapplicable because the previous action had not involved an easement claim. Following a hearing, the trial court entered an order on June 28, 2018, denying the motion to dismiss upon finding that the court could not be "satisfied that changed facts [had] not arisen in this matter or that new facts [had] not occurred since the prior litigation between these parties that [had] altered the parties' legal rights and relations with respect to the pending cause of action."

Michael and Tammy Miller filed an answer to the complaint on October 12, 2018, denying that Kenneth Miller did not have means of access to the Island Tract other than across the Servient Estate. Noting that they could not answer for Lili Snyder, Michael and Tammy Miller asserted seven defenses, including (1) *res judicata*; (2) the seven-year statute of limitations for statutory adverse possession under Tennessee Code Annotated § 28-2-103 (2017); (3) laches; (4) Kenneth Miller's failure to seek an easement in previous litigation or through purchase; (5) the existence of "another, less intrusive, path of access across [the Servient Estate] to the Island Tract, which could be purchased as an easement"; (6) failure to join adjoining land owners as necessary parties pursuant to Tennessee Code Annotated § 54-14-103 (2008) and Tennessee Rule of Civil Procedure 19.01; and (7) equitable estoppel.

On November 1, 2018, Michael and Tammy Miller filed a motion for summary judgment, again asserting that Kenneth Miller's claims were barred by *res judicata* or alternatively, the statute of limitations provided in Tennessee Code Annotated § 28-2-103. Kenneth Miller filed a response, asserting that neither *res judicata* nor the statute of limitations was applicable. Following a hearing, the trial court entered an order on December 20, 2018, denying Michael and Tammy Miller's motion for summary judgment upon finding, *inter alia*, that *res judicata* was inapplicable and that Kenneth Miller had

5

"put sufficient facts in the record for a trier of fact to find an implied easement." The trial court in this order set the case for trial while also directing the parties to participate in mediation. The mediator subsequently reported to the trial court that the parties had participated in mediation but had not reached a settlement.

Michael and Tammy Miller subsequently filed an offer of judgment on April 1, 2019, pursuant to Tennessee Rule of Civil Procedure 68, setting forth a proposed judgment that they would agree to have entered against them. As referred to in testimony during trial, this offer of judgment in essence provided for a shared road right-of-way around the perimeter of the Servient Estate but not through the front yard. The offer of judgment was not accepted.

The trial court conducted a bench trial over the course of two days on April 10 and 11, 2019. Kenneth Miller presented his own testimony as well as that of Susan Gibson and Pamela Miller, two of his daughters; Kraig Kimbrel, who had hunted on the Island Tract for many years with Kenneth Miller's permission; Charles McAmis, who had hunted on Lynn Mountain behind the Servient Estate with Lattie Miller's permission in the 1960s and 1970s; David Stout, a friend of Kenneth Miller's who had logged the Island Tract in 2003; Charles Allen and John Allen, brothers whose father had rented and grown crops on a parcel of farmland adjoining the Servient Estate before purchasing the farmland parcel with an express easement in about 1970; and Sam Beale, Kenneth Miller's son-in-law, who had built the cabin on the Island Tract and resided with his wife, Julie Beale, in R.G. and Mollie Cress's former home at 304 Lincoln Drive.

Michael and Tammy Miller each testified during trial. In addition, they presented the testimony of Roland Blankenship, a neighbor and cousin to the Miller siblings; David Timothy Buck, a close friend of Michael Miller's who had often visited the Servient Estate; Petra Becker, a realtor with Re/Max Checkmate in Johnson City who had listed the Servient Estate for sale on Michael and Tammy Miller's behalf; and Conrad Shigematsu, a potential buyer for the Servient Estate who testified that he and his wife would not complete the purchase if an easement were permitted to run across the front yard. The parties presented several stipulated exhibits, including deeds in the chains of title for the involved parcels; a survey of the parcels completed by Thomas Lynn Snyder of Snyder Surveying, Inc., and dated November 20, 2017 ("Snyder Survey"); aerial photographs; and photographs taken on or near the Servient Estate and bridge to the Island Tract. Michael and Tammy Miller also presented the sales and purchase agreement they had previously entered into with the Shigematsus.

In its final judgment and incorporated memorandum opinion entered on May 22, 2019, the trial court found that the Island Tract lacked public access and that it had been used primarily for hunting and recreation for generations. Upon Kenneth Miller's

6

argument at trial that an express easement may have been created by a 1950 "Division Deed" dividing the original 186 acres of farmland, the trial court determined that no express easement existed for access to the Island Tract.[5] The court also found that the evidence was insufficient to establish the existence of a prepared driveway from the "unimproved portion of Lincoln [Drive] all the way down to the bridge."

As to an implied easement, the trial court found that Kenneth Miller had failed to establish an implied easement over the Servient Estate by prior use. Although the court found that various users had accessed the Island Tract by walking or driving across the Servient Estate, the court stated that it was "unable to find" that "particular area" where Kenneth Miller requested designation of the easement had been established by prior use. However, the court did find that Kenneth Miller was entitled to an implied easement by necessity appurtenant to the Island Tract because it was "land-locked from him."

In its analysis, the trial court then turned its attention to the location of the implied easement by necessity. Weighing "the equities" involved, the court found that an easement through the front yard of the Servient Estate would be far more burdensome to Michael and Tammy Miller than establishing an easement around the perimeter of the Servient Estate would be to Kenneth Miller. In so finding, the court credited the testimony of Michael Miller, Ms. Becker, and Mr. Shigematsu in determining that Michael and Tammy Miller stood to lose "ten of thousands of dollars" in "loss of value to their property" if the easement were to run through the front yard of the Servient Estate. The court also found that Kenneth Miller had not "maintained an easement" prior to trial in that he had never built a road leading to the bridge.

Ultimately, the trial court directed in its final judgment that the easement would be "a permanent 12 ft. non-exclusive joint-use road right of way/easement for ingress and egress to the [Island Tract] along with the right to build, maintain, repair, and improve said road right of way which shall extend from the residential property of [Kenneth Miller]." In its incorporated memorandum opinion, the court clarified that the easement would extend from the edge of the Kenneth Miller Tracts at 304 Lincoln Drive "across the back lot line, the western lot line of Michael and Tammy Miller next to the Lathams." We note that the parcel of farmland adjoining the Servient Estate that had been owned by the Allens had by the time of trial been sold to members of a family with the surname, Latham, and is often referred to in the record as the "Latham Property." The court also directed that the right of way/easement would "hug the property line" and "make necessary curvatures to avoid and get no closer than two feet from fencing of cemeteries existing." The court further directed that the easement would "follow the southern line of Michael and Tammy

---

[5] On appeal, Kenneth Miller acknowledges that he did not plead an express easement in his complaint. The trial court's finding that no express easement existed is not at issue on appeal.

Miller," keeping "six feet off of that property line to avoid issues with the river topography" and "follow and end to where they can turn into the bridge with a regular 2-axle vehicle."

Concerning existing cemeteries, testimony and a photograph demonstrated that Mary June Miller had been buried on the Snyder Tract with headstones marking her grave and the future resting place of Kenneth Miller. It is undisputed that no other graves were in this small family cemetery, which at the time of trial remained unfenced. In addition, testimony and a photograph demonstrated that a small fenced cemetery existed on the Servient Estate where the State of Tennessee had placed an historic marker because Isaac Lincoln, Abraham Lincoln's great uncle, was buried there.

In its final judgment, the trial court appointed Thomas Snyder to add the easement to the survey he had previously completed with the cost of the easement survey to be borne by Kenneth Miller. The court declared "[t]he rest of the Michael and Tammy Miller property . . . to be free of any right-of-way, right, title, or interest of Kenneth C. Miller or Lili Snyder, their heirs or assigns." Finding that testimony had indicated that "there [was] a reason to control the access" from trespassers and that Michael and Tammy Miller, their heirs, or assigns had "the right to gate the right-of-way at the property line" between the Servient Estate and the Island Tract, the court directed that Michael and Tammy Miller could lock the gate but "must always provide keys and access to Kenneth C. Miller, his heirs and assigns using the right-of-way."

The trial court in its final judgment also entered default judgment "as to all matters or issues which were or which might have been raised in this litigation as to Lili Snyder." The court specifically found that although Lili Snyder had been "duly served with a copy of the Summons and Complaint on May 3, 2018, and properly notified of all hearings, including the trial on the merits, Lili Snyder [had] filed no responsive pleadings, [had] not appeared at any of the proceedings, and [did] not have an attorney of record." The court directed that the right of way/easement awarded to Kenneth Miller would cross twelve feet on the Snyder Tract property line "[i]n the back." The court clarified that this placement across the Snyder Tract was in part to "keep at least four [feet] off of the burial spot" of Mary June Miller.

Following the trial court's oral ruling at the close of trial but before entry of the final judgment, Michael and Tammy Miller filed a "Motion for Direction Concerning Lincoln Drive/Right of Way," on May 15, 2019, requesting "direction or clarification in the Court's Final Judgment as to their access to their residential property." Averring that "there [was] uncertainty as to whether the County Road known as Lincoln Drive extends to the Northern boundary of the [Servient Estate]," Michael and Tammy Miller sought "a declaration that their property [was] served by an easement/right of way if Lincoln Drive in fact [did] not extend" to the Servient Estate. Following a hearing, the trial court entered an order on May

29, 2019, denying the motion for direction upon determining that it could not grant the relief requested because the issue had not been pled or tried before the court.

The trial court entered an "Order Approving Survey and Metes and Bounds Description of Right of Way," on June 7, 2019, approving, ratifying, adopting, and incorporating by reference Thomas Snyder's updated survey and a metes and bounds description for the easement granted to Kenneth Miller across the Servient Estate and the Snyder Tract. For ease of reference, a digital copy of the survey reflecting the right of way ordered by the trial court is attached as an addendum to this opinion. On the same day, the court also entered an agreed order correcting two typographical errors in the final judgment.

On June 21, 2019, Lili Snyder, acting without benefit of counsel, filed a motion to alter or amend the judgment, pursuant to Tennessee Rule of Civil Procedure 59.04. In her motion, Lili Snyder asserted that the trial court's memorandum opinion contained conflicting language in that the court stated that she had no rights affected in this case but then determined that the right of way awarded to Kenneth Miller would cross the back of her property. Lili Snyder requested that the trial court either alter or amend the language of the judgment to resolve the purported conflict or set aside the default judgment entered against her with additional time allowed for her to retain an attorney and file an answer to the complaint. She concomitantly filed a motion for default judgment pursuant to Tennessee Rules of Civil Procedure 55.02 and 60.02. Michael and Tammy Miller filed a response, objecting to Lili Snyder's motions and averring that she had received notice of all proceedings but had failed to participate in the case. Michael and Tammy Miller concomitantly gave notice via certified mail to Lili Snyder of a hearing set on her motions for July 17, 2019.

At the July 17, 2019 hearing, Lili Snyder appeared and was represented by counsel, attorney Lois B. Shults-Davis, who subsequently became Kenneth Miller's counsel on appeal as well. On July 24, 2019, the trial court entered an order denying Lili Snyder's motions to alter or amend and to set aside the default judgment upon finding, *inter alia*, that she had failed to take action throughout the pendency of the case despite having been provided with notice of all proceedings as a defendant in the action. Kenneth Miller and Lili Snyder timely appealed.

## II. Issues Presented

Kenneth Miller and Lili Snyder present five issues on appeal, which we have reordered slightly and restated as follows:

1. Whether the trial court erred by finding that no right of way across the Servient Estate had been permanently established.

2. Whether the trial court erred in determining the means of location and the limitation of the extent of the easement awarded to Kenneth Miller.

3. Whether the trial court erred by finding lack of settlement and pursuit of litigation as a determinative equity.

4. Whether the trial court erred by granting relief against Lili Snyder that was not pled in the complaint against her.

5. Whether the trial court erred by failing to follow the standards of the Family Burial Grounds Protection Act, codified at Tennessee Code Annotated §§ 46-8-101-103 (2007 & Supp. 2019), in awarding an easement, and if so, whether the judgment should be modified to comply with the Act.

### III. Standard of Review

Our review of the trial court's judgment following a non-jury trial is *de novo* upon the record, with a presumption of correctness as to the trial court's findings of fact unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 204 (Tenn. 2012). "In order for the evidence to preponderate against the trial court's findings of fact, the evidence must support another finding of fact with greater convincing effect." *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn. Ct. App. 2006) (citing *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001)). We review questions of law, including those of statutory construction, *de novo* with no presumption of correctness. *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000) (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 924 (Tenn. 1998)). Likewise, we review a trial court's interpretation of procedural rules *de novo* with no presumption of correctness. *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 414 (Tenn. 2013). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison v. Allen*, 338 S.W.3d 417, 426 (Tenn. 2011); *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

A trial court's decision concerning whether a default judgment should be set aside is reviewed by this Court under an abuse of discretion standard. *See Patterson v. SunTrust Bank*, 328 S.W.3d 505, 509 (Tenn. Ct. App. 2010). *See In re Estate of Greenamyre*, 219

S.W.3d 877, 886 (Tenn. Ct. App. 2005) ("[A] trial court will be found to have 'abused its discretion' only when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party.") (internal citations omitted). Likewise, "[w]e review a trial court's denial of a Tenn. R. Civ. P. 59.04 motion to alter or amend a judgment for abuse of discretion." *Robinson v. Currey*, 153 S.W.3d 32, 38 (Tenn. Ct. App. 2004) (quoting *Chambliss v. Stohler*, 124 S.W.3d 116, 120 (Tenn. Ct. App. 2003)).

### IV. Implied Easement

In its final judgment, the trial court found that Kenneth Miller had failed to establish by a preponderance of the evidence that an implied easement by prior use appurtenant to the Island Tract existed across the Servient Estate in the particular location that Kenneth Miller claimed, in other words, through the front yard of the residence on the Servient Estate. The trial court did find that Kenneth Miller was entitled to an implied easement by necessity in order to access the Island Tract. On appeal, Kenneth Miller primarily takes issue with the location of the easement granted by the trial court.[6] He contends that the trial court erred by finding that no right of way across the front yard of the Servient Estate had been permanently established as an implied easement by prior use. In the alternative, Kenneth Miller contends that in directing the placement of the implied easement, the trial court erred in its determination of "the means of location and the limitation of the extent of the easement," placed around the perimeter of the Servient Estate instead of through the front yard.

On appeal, Michael and Tammy Miller do not take issue with the trial court's finding of an implied easement by necessity. Requesting that the easement grant be affirmed, they assert that the trial court properly located the easement along the way most reasonable and equitable for the parties. Upon careful review, we determine that the evidence does not preponderate against the trial court's findings that no implied easement by prior use existed in the location requested by Kenneth Miller and that the placement of the implied easement by necessity along the perimeter of the Servient Estate was reasonable.

---

[6] Although Kenneth Miller and Lili Snyder are both appellants with common appellate counsel in this matter, we note that Lili Snyder did not file a pleading before filing her motions to set aside the default judgment and to alter or amend the final judgment. For ease of reference and clarity's sake in this opinion, we will attribute arguments made in the principal and reply briefs concerning the issues not involving Lili Snyder's post-trial motions as though made solely by Kenneth Miller.

"'An easement is a right an owner has to some lawful use of the real property of another.'" *Cellco P'ship v. Shelby Cty.,* 172 S.W.3d 574, 588 (Tenn. Ct. App. 2005) (quoting *Pevear v. Hunt,* 924 S.W.2d 114, 115 (Tenn. Ct. App. 1996)) (internal citation omitted). Tennessee courts recognize several different types of easements, which this Court has summarized as follows:

> (1) express grant, (2) reservation, (3) implication, (4) prescription, (5) estoppel, and (6) eminent domain. Easements can be divided into two broad classes, easements appurtenant, and easements in gross. In an easement appurtenant, there are 2 tracts of land, the dominant tenement, and the servient tenement. The dominant tenement benefits in some way from the use of the servient tenement. Easements in gross are simply a personal interest or right to use the land of another which does not benefit another property, or dominant estate, thus easements in gross usually involve only one parcel. An easement appurtenant to land is favored over an easement in gross in Tennessee.

*Cellco,* 172 S.W.3d at 588 (quoting *Pevear,* 924 S.W.2d at 115-16) (internal citations omitted). "An easement appurtenant runs with the land and 'may be enforced by subsequent purchasers of the dominant tenement against owners of the servient tenement.'" *Stange v. Roberts*, No. M2019-01060-COA-R3-CV, 2020 WL 1808615, at *3 (Tenn. Ct. App. Apr. 9, 2020) (quoting *Holder v. Serodino*, No. M2014-00533-COA-R3-CV, 2015 WL 5458377, at *8 (Tenn. Ct. App. Sept. 16, 2015)).

In the case at bar, Kenneth Miller requested and the trial court found an implied easement appurtenant benefiting the Island Tract. Tennessee courts have long held that to find the existence of an easement by implication, the following elements must be present:

> (1) A separation of the title; (2) Necessity that, before the separation takes place, the use which gives rise to the easement shall have been long established and obvious or manifest as to show that it was meant to be permanent; and (3) Necessity that the easement be essential to the beneficial enjoyment of the land granted or retained.

*Cellco,* 172 S.W.3d at 589 (quoting *Johnson v. Headrick,* 237 S.W.2d 567, 570 (Tenn. Ct. App. 1948)). A fourth element of continuous servitude was indicated in *Cellco* as "sometimes added" but has been found since by this Court to be "subsumed within the other three long-established elements." *See Ingram v. Wasson,* 379 S.W.3d 227, 242 n.17 (Tenn. Ct. App. 2011) (citing *Cellco,* 172 S.W.3d at 589). The burden of proof for establishing an implied easement is by a preponderance of the evidence, rather than the burden of clear and convincing evidence needed to establish a prescriptive

12

easement.  *See Haun v. Haun,* E2004-01895-COA-R3-CV, 2005 WL 990566, at *4 (Tenn. Ct. App. Apr. 28, 2005) (citing *Allison v. Allison,* 193 S.W.2d 476 (Tenn. Ct. App. 1945)) (additional internal citations omitted).

On appeal, Kenneth Miller takes issue with the trial court's finding that an implied easement appurtenant to the Island Tract existed only by necessity and not by prior use. This Court has explained the distinction between these two types of easement by implication as follows:

> [T]here is considerable overlap between an easement implied from prior use and an easement created by necessity.  Both are implied, both arise from a conveyance, both hinge on a finding of necessity.  Hence, the confusion.  To distinguish between them, an easement created by necessity "does not depend on a prior use" and the fact that any prior use "is permissive is irrelevant to the question [of] whether [an] easement [created by] necessity will be deemed to exist."  25 Am. Jur. 2d *Easements and Licenses* § 32. Moreover, an easement created by necessity "need not be in existence at the time of the conveyance" and may allow for a route of access where one previously did not exist.  *Id.; see Cellco,* 172 S.W.3d at 591.

*Ingram,* 379 S.W.3d at 240 (footnote omitted).

The *Ingram* Court further explained an implied easement by prior use:

> Unless a contrary intent is expressed or implied, the circumstance that prior to a conveyance severing the ownership of land into two or more parts, a use was made of one part for the benefit of another, implies that a servitude was created to continue the prior use if, at the time of the severance, the parties had reasonable grounds to expect that the conveyance would not terminate the right to continue the prior use.

> The following factors tend to establish that the parties had reasonable grounds to expect that the conveyance would not terminate the right to continue the prior use:

> > (1)    the prior use was not merely temporary or casual, and

> > (2)    continuance of the prior use was reasonably necessary to enjoyment of the parcel, estate, or interest previously benefited by the use, and

13

> (3)     existence of the prior use was apparent or known to the parties,
>
>     . . .
>
> Restatement (Third) of Prop.: Servitudes § 2.12.  The Restatement explains that the rule regarding easements implied from prior use is based on the assumption that people intend to buy and sell land with the existing access arrangements, and it furthers the policy of protecting the reasonable expectations and the intent of parties to such transactions.  *Id.* at cmt (a). *Compare* 25 Am. Jur. 2d *Easements and Licenses* §§ 25-29 (listing requisites for easement by implication from preexisting use), *Cellco,* 172 S.W.3d at 589 (listing elements for easement by implication).

*Ingram*, 379 S.W.3d at 239.

On appeal, Michael and Tammy Miller do not dispute the trial court's finding that an easement across the Servient Estate to enable ingress and egress to and from the Island Tract arose from Kenneth and Mary June Miller's 2010 conveyance of the Servient Estate to them.  This conveyance had the effect of severing the Servient Estate from the Island Tract, and the Servient Estate then presented a barrier, as did the Snyder Tract, between the Kenneth Miller Tracts and the Island Tract.  Michael and Tammy Miller also do not dispute the trial court's finding that an easement appurtenant to the Island Tract is necessary in order for Kenneth Miller to have ingress to and egress from the Island Tract. However, Michael and Tammy Miller assert that the trial court properly found that the particular right of way requested by Kenneth Miller across the front yard of the Servient Estate had not been established by prior use and was not "obvious or manifest as to show that it was meant to be permanent." *See Cellco,* 172 S.W.3d at 589 (quoting *Johnson v. Headrick,* 237 S.W.2d 567, 570 (Tenn. Ct. App. 1948)).

In this regard, Kenneth Miller contends that the evidence preponderated against the trial court's finding of no established prior use over the particular right of way requested. He thereby asserts that the easement granted by the trial court should have been placed across the right of way he requested.  As an alternative argument, Kenneth Miller contends that his requested placement of the easement through the front yard of the Servient Estate is reasonably necessary to his enjoyment of the Island Tract.  Michael and Tammy Miller contend that the trial court properly found that although an implied easement was necessary, it was not reasonably necessary to have that right of way run across the Servient Estate's front yard and that it was reasonable to place the easement around the perimeter of the Servient Estate instead.  We will address each of these arguments in turn.

14

## A. Prior Use

Concerning prior use, the trial court stated in its memorandum opinion in pertinent part:

[Kenneth Miller] and [Michael and Tammy Miller] own property along the shores of the Watauga River in Carter County, Tennessee. Their property is accessed initially at Lincoln Drive. Lincoln Drive is public right-of-way, but it ends prior to reaching [Michael and Tammy Miller's] property. They have longstanding use of a roadway that leads to [Michael and Tammy Miller's] property that is an extension of Lincoln. Now, the Lincoln public road is maintained with asphalt up to and near the property of [Kenneth Miller] and it turns to gravel soon after.

All of this property was part of a family farm that has existed since the 1940s. It has been subdivided several times; portions have sold off. The most applicable portion for today's trial is the Latham property, which is west of the property owned by [Kenneth Miller] and [Michael and Tammy Miller]. [Kenneth Miller] sold this tract of property, which was a large cornfield most of the time, to the Allen family after first leasing it to them for many years. It is directly west of the parties' property and it extends around the western side of [Michael and Tammy Miller's property] and along the south line of their property towards the sluice river island, which is approximately 18 acres owned by Kenneth C. Miller.

By deed transacted in 2010 Kenneth Miller and his wife conveyed the property owned by Michael and Tammy Miller. Kenneth Miller's wife is now deceased. From the testimony that I've heard today, this litigation most likely would have never been filed if she was still alive; this would have been settled by the family. But when they conveyed the property, they failed to reserve an express easement across the [Michael and Tammy Miller] property to the island. Kenneth Miller and the properties owned by him are separated from the island property by the land of his son and daughter-in-law.

The Court finds that this island tract lacks public access. You have to ford to the property from what was formerly the Allen cornfield. Where the bridge is presently located, which was built by Kenneth C. Miller, it is a sturdy bridge and the bridge was built in 1987, or very close to 1987. The bridge is not located where the family has traditionally crossed . . . onto the island prior to the building of the bridge. When they owned the property,

15

they tended to cross a little south of the tract now owned by [Michael and Tammy Miller].

When the TVA is not generating electricity and less water is discharged, it can be still forded through the sluice area from what was formerly Allen farm property. The bridge is suitable for truck vehicle traffic. There is no housing. There are no farming operations on the island. It is essentially a recreation area controlled by Kenneth C. Miller, the owner of the property.

It has been used for generations of the family as a place to go shoot target, for friends and acquaintances to hunt, especially duck and goose hunting. It is a place for family members to take walks, to explore, to have a cabin that was more recently built. There are no roads on the property. It has been logged at least three times, in the memory of those who testified, especially Michael Kenneth Miller; he was persuasive in that regard.

That's essentially the only time that there's been a lot of vehicles go to and from the island, except the Allen family might use it as a shortcut. To keep farm equipment off the county roads, it was a shortcut back to the Allen farm, to get from the cornfield, over. And it could -- the river and the island could be traversed with a tractor. Charlie Allen was an excellent witness and his testimony was persuasive in that regard.

The property owned by [Michael and Tammy Miller] was owned by Kenneth Miller and wife, who had previously allowed Michael Miller's grandparents to build a home there when they retired from up north and came back. A house was constructed in approximately 1972. It later became in a state of disrepair.

Michael and his wife lived in Atlanta, were there for many years. By 2010, the health of Mr. and Mrs. Kenneth Miller had declined, especially Kenneth Miller. He had suffered from a heart attack. Health is much better now, it appears, than in 2010. Decisions had to be made by Michael and Tammy Miller about what to do, to relocate for work. They had a young daughter. They chose to raise their daughter in East Tennessee, surrounded by family where they could be near Michael's parents to assist in their care and, the evidence was persuasive, to assist them financially.

The [Kenneth] Millers, although of advanced age, had a substantial $60,000 mortgage at the time, which was unexplained. They purchased the

16

3-plus acre lot that was formerly the residence of Michael's grandparents. The house in its then condition in 2010 was of little value. It was questionable whether it should be torn down and started anew or renovate it. Michael and Tammy Miller decided to renovate the property.

Plaintiff Kenneth Miller and his wife agreed to accept $25,000 in consideration for the property. $33,000 was paid. In addition, Michael and Tammy Miller, who were excellent witnesses and who are to be believed and were believed, spent $140,000 of money to do extensive renovations and repairs. They also invested a lot of their time and effort in doing a lot of the work themselves. They did a lot to improve the property.

Time goes on. Late 2014, Michael and his sisters' mother died.

* * *

Kenneth Miller needed an easement. He owns the island. He has elected to ask this Court to grant him one [rather] than his son and daughter-in-law.

Pam Miller seemed to have the most facts that she provided the Court on the location, what they assert is the drive from the front of the Michael and Tammy Miller property, using their driveway past where the old barn was and basically 120, 180 feet straight shot towards the bridge. She provided a lot of detail, evidence that would tend to support that this was the location of a long-used road toward the bridge.

She was unpersuasive. I asked her if she was talking to witnesses out of the courtroom. Under oath she perjured herself and said no. But Roland Blankenship, who was an excellent witness, recounted to this Court all kinds of testimony from the trial that he heard out in the hallway coming from Pam Miller and others. If she's willing to stand in front of the Court and perjure herself, then she has no persuasiveness in her testimony when she takes the stand to testify about the facts of the case. The Court has disregarded her testimony in whole. I will not base my judgment on testimony from a perjurer.

The Allens were excellent witnesses, salt-of-the-earth brothers, represent the best of East Tennessee. They were honest and straightworthy. They could not establish a roadbed that extended beyond the barn towards the bridge. None of the witnesses really were able to do that to persuade this Court. Even Mr. Kenneth Miller, who went into detail, and I believed him,

17

on how the bridge was built, he was rightfully proud of what he had done. He told his mother to watch it and make sure it was done right. They had an excellent relationship, they trusted each other. But he did not testify that he actually built or extended the unimproved portion of Lincoln all the way down to the bridge.

There's no evidence of a prepared driveway. The only evidence that I heard was that folks in the 60s and the 70s would park in the vicinity of the old barn, which is as far as the improved driveway on Michael and Tammy Miller's property. They would park there and walk across and then, once the bridge was built, they would either just drive through the yard because that essentially was a yard from when the grandparents built their house in 1972, or they would walk there. Some would come behind the house and walk there. Some would come from the Allen cornfield, that area.

The evidence was not persuasive as to an express easement. I was unable to identify the location of an express easement. It was certainly not present past the house now occupied by Michael and Tammy Miller. The photographs, nothing, showed anything to really indicate that there was a long-used driveway; the vehicle usage was very infrequent.

Next the question is, is there an easement by implication. There's really two that are applicable to this case. Easement—that is both of them are implied. Implied easement by use and easement by necessity. At one point title was all held by Kenneth [Miller] and wife.

The next issue was, was there a separation long-established and obvious use showing that the use was intended to be permanent. It cannot be merely temporary or casual; it has to be a continuous use reasonably necessary to the enjoyment of the parcel and existence of the prior use was apparent or known to the parties. If all that is present, then the people who bought, or in this case – well, bought; there was consideration to those who sold it, parents to son and daughter-in-law, the law assumes that they knew of the existing access arrangements and the law will memorialize that with the easement.

I am unable to find the second element, that this particular area that they are requesting as they have designated was there. I do find that there is a need to cross [Michael and Tammy] Millers' property to get to it and that it has been used and that easement by necessity or way of necessity has been

18

established by [Kenneth Miller]. And [Kenneth Miller] is entitled to an easement by necessity.

He has no other access. He cannot get there from the river; he cannot get there from any other part of his property. It is land-locked from him. It does not have public access.

The trial court thus found that Kenneth Miller had failed to establish by a preponderance of the evidence that prior to the 2010 conveyance, the particular right of way requested across the Servient Estate's front yard had been "long established and obvious or manifest as to show that it was meant to be permanent." *See Cellco*, 172 S.W.3d at 589 (quoting *Johnson v. Headrick,* 237 S.W.2d 567, 570 (Tenn. Ct. App. 1948)). The court also essentially found that Kenneth Miller had failed to establish that prior use of this particular right of way had been more than temporary or casual. *See Ingram*, 379 S.W.3d at 239. Upon thorough review of the record, we agree with the trial court.

At the outset, it is important to emphasize that the trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Morrison*, 338 S.W.3d at 426. The trial transcript reflects that during the trial and before Pamela Miller testified, the trial court questioned Pamela Miller concerning a report the court had received from its bailiff that Pamela Miller was discussing testimony with other witnesses in the hallway, all of whom had been instructed at the beginning of trial not to discuss the case. Under oath, Pamela Miller assured the court that she and other witnesses had not been discussing the case or their testimonies. She subsequently testified before the court.

A later witness, Mr. Blankenship, in responding initially to a question regarding his perception of the Miller family relationships, testified that he had heard Pamela Miller in particular discussing the case with other witnesses and instructing one witness as to how he should testify. The trial court questioned Mr. Blankenship further as to what had occurred in the hallway as he was waiting to testify. The trial court separately questioned Ms. Becker, the realtor, at the close of her testimony concerning what she had heard in the hallway, and she corroborated Mr. Blankenship's account. The court in its ruling at the close of trial, later incorporated into the final judgment, found that Pamela Miller had lied to the court when she had been questioned directly about discussions outside the courtroom. On this basis, the court discredited Pamela Miller's testimony.

In his argument in support of an implied easement by prior use, Kenneth Miller does not directly question the trial court's decision that Pamela Miller's testimony was not persuasive due to the court's credibility finding. He asserts that even setting aside Pamela Miller's testimony, the evidence preponderated in favor of a finding that "access to the

island [had] always been through the front of the property where the island and bridge access was located." We disagree. As the trial court found, testimony varied among witnesses regarding how they and others they had observed traversed the distance between what had been the site of a barn, located approximately at the area that the trial court found to be an "improved driveway" on the Servient Estate, to access the Island Tract.[7] People had walked or driven straight through the front yard at times, but they had also walked from behind the house or from what had been the Allens' farmland and was now the Latham Property.

Kraig Kimbrel testified that he had hunted on the Island Tract with Kenneth Miller's permission from 1985 through 2010 and that he had accessed the bridge by crossing in front of the home on the Servient Estate. Mr. Kimbrel had also been a member of a small waterfowl hunting club that entered into a lease with Kenneth Miller, beginning in 2003 and lasting for three or four years, to allow members access to the Island Tract.

Charles McAmis testified that he had hunted on Lynn Mountain behind the Island Tract from 1966 through the early 1970s. When questioned regarding how he accessed Lynn Mountain, Mr. McAmis stated that after reaching the end of Lincoln Drive, he would "come straight up by the river. There was an old barn sitting up here and we parked right there at the barn." He confirmed that he would drive through the front yard of the Servient Estate. Mr. McAmis reflected: "I don't know if it was exactly a road, but, you know, people drove through there all the time . . . [j]ust tracking until it was a road." Mr. McAmis acknowledged that he had not accessed Lynn Mountain via the Servient Estate since the early 1970s.

David Stout testified that he had logged on the Island Tract once in 2003 and that he had driven logging trucks through the front yard of the Servient Estate. Mr. Stout acknowledged that he had not been on the Island Tract since 2006.

Charles Allen and John Allen each respectively described how they had accessed the cornfield their father rented from Kenneth Miller from the 1960s through approximately 1970. According to Charles Allen, "the access to the island was in the same pathway [as the bridge has been since it was built] up through there. There was no fence, no road or nothing, but it was just tracks that we followed the same place all the time to go into the cornfield." He stated that once they reached the Servient Estate, they traversed "[a]bout the same area from the bridge, from river or sluice, maybe 20 . . . feet from the river, the front of the house; the house fronted the river." He added that when he walked

---

[7] Several witnesses noted that a barn was on the Servient Estate prior to the 2010 conveyance to Michael and Tammy Miller but that the barn had burned down. Michael Miller indicated in his testimony that he and his wife had cleaned up around the barn after they moved into the residence and had ultimately laid a concrete pad over the place where the barn had been.

across the Servient Estate to reach the corn field, there was a "hog barn" on the lower part of the lot and he would walk on the river side of the barn. Charles Allen also testified that he would access the Island Tract during the same time frame to ford the river with farm equipment. He explained that in about 1970, his father bought the property where he had grown corn and was then granted an easement across Kenneth Miller's property. He acknowledged that after 1970, he had not accessed the cornfield in the same way and that his family no longer owned the adjoining property.

John Allen also acknowledged that his experience accessing his father's cornfield via the Servient Estate was confined to farming the adjacent property and occasionally hauling cattle to and from that property approximately forty years prior to trial. He testified that he had crossed through the front yard of the Servient Estate, which he stated was a "yard, but you could see where people drove the same place all the time." When questioned by the trial court regarding whether the place he could see where people had driven resembled the tracks made from having recently driven in a hayfield, John Allen responded that "[i]t was a little bit beyond that." He indicated that during that time period, he had crossed the river on a tractor several times beside the spot where the bridge was eventually built.

Mr. Beale testified that at the time of trial, he had been married to Kenneth Miller's daughter, Julie, for thirty years and had resided for five years at 304 Lincoln Drive. He stated that he had accessed the Island Tract both across the front yard of the Servient Estate and occasionally by traversing around the back of the Servient Estate. Mr. Beale oversaw the construction of the cabin on the Island Tract from 2011 to 2012, after the 2010 conveyance of the Servient Estate to Michael and Tammy Miller. He explained that during that time period, "[t]he only part that wasn't covered with gravel would be this grassy part right here to the right of [Michael Miller's] pad where the barn used to sit." Reviewing a survey of the Servient Estate and Island Tract, Mr. Beale indicated an area on the survey and stated that the way he accessed the Island Tract while building the cabin was as follows:

> [I]t may not be this exact road because it's had this brown gravel put on it, but it's pretty much the road that we followed, and then it's the pad was a barn, and then we would follow this little area to the bridge that goes across the sluice.

According to Mr. Beale, he and others working on the cabin had permission from Michael and Tammy Miller to access the grassy part of their front yard with the following "specific rules":

> We didn't want to – we didn't drive across it if it was raining or if there was frost on the grass or if there was anything that would, so to speak, cause damage to what their perceived yard would be. If it wasn't on the gravel

21

area, we respected their wishes and did not damage the grass that we drove across to get to the property. Again, the road as it is right now may vary by ten feet, five feet from what it used to be, but it's not exactly the same place, but it went to the same place across the same area.

As the trial court noted, Kenneth Miller testified concerning the construction of the bridge, which was completed in 1987 by Bristol Steel. He also testified that he had taken down a "huge barn" to build the residence on the Servient Estate in its place for his parents. According to Kenneth Miller, "the road always come right up through there, went through by the front of the big barn and sluice, right straight down to the – to the island gate."

Susan Gibson testified that as the daughter of Kenneth and Mary June Miller, she had grown up on the properties at issue through her departure to attend college in the early 1980s. She also testified that she remembered the big barn with horses, on the site where the residence was built, from when she was a small girl. Concerning how she utilized the Island Tract in her early years, Ms. Gibson stated:

> We would go over there and, you know, walk, hike around. We always were on the mountain growing up; we were always with our dogs. Friends, we had friends that came over – I did all through high school, college – you know, that came up to the river and to our house to enjoy fishing and all of that. We have a lot of friends who like to hunt and so my father was always giving people permission.

According to Ms. Gibson, once the bridge was built, people accessed the bridge through the front yard of the Servient Property on a "road" leading to the bridge that "was kind of like a dirt road that was just worn down through years and years."

Mr. Blankenship testified that he was a cousin to the Miller siblings and that he resided on Lincoln Drive approximately one-quarter mile from the Servient Estate. He stated that he grew up in the area but then relocated out of state until he returned in 2009 after retiring from his career as an intelligence analyst with the Department of Defense. Mr. Blankenship relayed that he often walked along Lincoln Drive near the Servient Property and that he had visited with Michael and Tammy Miller "on occasion." Concerning vehicular traffic across the Servient Property, Mr. Blankenship stated:

> There's a lot of traffic on our road, usually sightseers that come down and turn around prior to their [Michael and Tammy Miller's] driveway. I've not personally seen anybody drive across their property other than their own vehicles.

22

Mr. Blankenship also testified that he had seen other individuals on the Servient Property, including Mr. Beale, fishermen, and some boys from a nearby neighborhood who had come to fish. When questioned regarding how the people he observed had accessed the Servient Estate, Mr. Blankenship responded: "Most of the time I believe they walk along the front, along the river front, but I've seen the family go through the backyard."

David Timothy Buck testified that he had been a close friend of Michael Miller's for forty-six years, had visited the Servient Estate often, and had sometimes mowed for Michael and Tammy Miller when they were on vacation. He stated that he had seen Miller family members walk "across the back" of the Servient Estate to the bridge "probably less than a handful of times" and that he had not observed people accessing the Servient Estate from the road. When questioned regarding whether he could "detect any difference between the surface of the land leading to the bridge as apart from the rest of [Michael and Tammy Miller's] yard," Mr. Buck answered in the negative.

Concerning the early years when he was growing up on the Miller property, Michael Miller testified that he and his grandfather would often ford the river in a truck to access the Island Tract. He stated that after the smaller barn burned down, he had that area graded and continued the existing driveway to it. Explaining that his grandparents had moved into the residence on the Servient Estate in 1973 and indicating spots on a survey map, Michael Miller described the Allens' access at that time as follows:

> And then Bill [Allen] entered into a lease agreement with my grandfather to lease the back field and they would grow hay one year, corn the next. But, again, it is true they used to bring their tractors through there, but they would come through, they would ford it, right here. That's where they came in and then they would go into the field this way or come around this way because there was no fence here. This was just open.

The evidence does not preponderate against the trial court's finding that Kenneth Miller had failed to establish that prior use of this particular right of way had been more than temporary or casual. *See Ingram*, 379 S.W.3d at 239.

On appeal, Kenneth Miller also argues that the trial court erred by finding that the existence of a paved road or driveway through the front yard of the Servient Estate was necessary to find prior use. However, upon close examination of the trial court's memorandum opinion, we do not find that the trial court imposed such a requirement. The trial court did find that what various witnesses referred to at times as a "road" across the front yard of the Servient Estate was not an established road. The court also found that the area in question, extending from where the barn had been to the bridge or the area near the bridge varied a great deal in witnesses' descriptions of its location and surface.

23

Upon a thorough review of the record and with deference to the trial court's credibility determinations and ability to observe the witnesses as they testified while reviewing (and often pointing to) maps and surveys, we conclude that the evidence does not preponderate against the trial court's findings in this regard. The court did not err in determining that Kenneth Miller failed to establish that an implied easement by prior use existed appurtenant to the Island Tract across the particular right of way claimed through the front yard of the Servient Estate.

### B. Location of Implied Easement by Necessity

Having determined that prior use did not establish an implied easement across the front yard of the Servient Estate, the trial court proceeded to consider where an implied easement by necessity should most reasonably and equitably be located. *See Ingram*, 379 S.W.3d at 240 ("[A]n easement created by necessity 'need not be in existence at the time of the conveyance' and may allow for a route of access where one previously did not exist" (quoting 25 Am. Jur. 2d *Easements and Licenses* § 32)). The trial court stated in its memorandum opinion in relevant part:

> And the question is: Where should the easement go? The shortest distance is what is most beneficial to Kenneth Miller. [Michael and Tammy Miller] want him to go through the back of the property, a longer distance. Leaving it there it would seem that the law favors Kenneth Miller's receiving the shortest distance. But the equities are not with Kenneth Miller. With litigation, he has tormented his son and daughter-in-law.
>
> He has not attempted to work this out among the family. The cost to use the longer route is not particularly high. It is a cost to Kenneth Miller. But the cost to Michael and Tammy is much higher if the easement is set out at the shortest location. Because Michael and Tammy Miller were more credible witnesses, so was Petra Becker and so was their prospective buyer of the property, all of them were in accord that the property is much less valuable with the easement in the proposed location by Kenneth Miller as compared to the back of the property. The burden on them, in loss of value to their property, is tens of thousands of dollars.
>
> It's important to remember when [Kenneth Miller] questions the costs of building the easement, [Kenneth Miller] has not maintained an easement, from the proof that I can see, really ever. There's no testimony about him building a road, him rocking it. What he did do was build a bridge in 1987

24

but there is no road to the property. He never built a road to the bridge; they just cut through the property.

So the land is river land; it's flat. I was not persuaded that the southern portion of Michael and Tammy Miller's property has any particular topography challenges that would preclude an easement going along through that. Basically you're driving through a field or a back yard to get to the property, as compared to driving through or walking through the front yard. To have similar type of access to what he has now, it is not a major burden on Kenneth Miller to use [Michael and Tammy Miller's] proposed location for the easement. At most, it's $5,000; and that's if he decides to put some gravel down.

The use of that island by [Kenneth] Miller and invitees and family has been infrequent; it's been for hunting; it's recreational; there's not been farming going on at the property. [Michael and Tammy Miller] have not denied family members use of it. I believe [Michael] Miller, that he had the gate padlocked to keep his donkeys in. I believe [Michael] Miller, that he provided the keys to family.

* * *

For these reasons, the Court finds that the . . . easement should be . . . 12-foot wide. Because vehicles have been used, we need 12 feet under this circumstance to get there. 12 feet is consistent with the express easement on other riverfront property through here way back. I felt like 12 feet was enough for a roadway. There's nothing that persuaded me that it should be more or less than 12 feet. I'm going to go with the more ancient 12 foot that exists in this area before.

It will be a 12-foot, non-exclusive, joint-use road, right-of-way for ingress and egress serving the property known as the island tract of Kenneth C. Miller, Carter County Tax Map 35, Parcel 101. He has a right to build, maintain, repair, and improve said road right-of-way to be built and extended from the residential property of Kenneth C. Miller at 304 Lincoln Drive, across the back lot line, the western lot line of Michael and Tammy Miller next to the Lathams.

It shall hug the property line. It shall make necessary curvatures to avoid and get no closer than two feet from fencing of cemeteries existing. It will follow the southern line of Michael and Tammy Miller. And on the

southern line it will be kept six feet off of that property line to avoid issues with the river topography and it will follow and end to where they can turn into the bridge with a regular 2-axle vehicle.

On appeal, Kenneth Miller insists that once the trial court had found that he was entitled to an implied easement by necessity to access the Island Tract, the court erred by failing to follow the procedure set forth in what was then codified at Tennessee Code Annotated §§ 54-14-101 *et seq.* This statute set forth the procedure for a private condemnation action, providing in pertinent part:

(a)(1) When the lands of any person are surrounded or enclosed by the lands of any other person or persons who refuse to allow to the person a private road to pass to or from the person's lands, it is the duty of the county court, on petition of any person whose land is surrounded, to appoint a jury of view, who shall, on oath, view the premises, and lay off and mark a road through the land of the person or persons refusing, in a manner as to do the least possible injury to those persons, and report to the next session of the court, which court shall, in accordance with this part, grant an order to the petitioner to open such road, not exceeding twenty-five feet (25′) wide if no subdivision regulations apply to the area where the land is located and not exceeding the width of the roads or streets required by subdivision regulations in effect in the area where the land is located, and keep the road in repair. If any person thereafter shuts up or obstructs the road, the person shall be liable for all the penalties to which any person is liable, by law, for obstructing public roads. The damage adjudged by the jury shall, in all cases, be paid by the person applying for such order, together with the costs of summoning and impaneling the jury. Gates may be erected on the roads. In counties with a metropolitan form of government, the maximum permissible width for a road under this section shall not exceed fifteen feet (15′).

As this Court has explained in a decision involving this version of the statute:

In reading the language of the statute, we note that the statute allows for a private condemnation action when a party's property is landlocked by persons "who refuse to allow to the person a private road to pass to or from the person's land. . . ." Tenn. Code Ann. § 54-14-101(a)(1). Strictly construing the statute, we conclude that a refusal of access to property is a necessary element before a petitioner may bring a condemnation action pursuant to Tennessee Code Annotated Section 54-14-101. Here, the record

26

establishes that the Appellants have not been refused access to their property. In fact, at trial, when [one of the appellants] was asked "Has anybody, the TVA or [the Appellees], ever denied you access to your property?", he replied "Not for farming purposes." Because there is no evidence in the record that the Appellants have ever been denied access to their property, we conclude that they have not yet met the threshold requirement for a condemnation action pursuant to Tennessee Code Annotated Section 54-14-101.

*Vise v. Pearcy Tenn. River Resort Inc.*, No. W2014-00640-COA-R3-CV, 2015 WL 4273492, at *5 (Tenn. Ct. App. July 15, 2015).

In his complaint, Kenneth Miller clearly set out four alternatives for the relief he sought, beginning each new claim with, "[a]lternatively." He first sought a permanent implied easement appurtenant by prior use. As a second alternative, he sought a permanent implied easement appurtenant by estoppel.[8] As a third alternative, he sought a permanent implied easement appurtenant by necessity. Finally, as fourth alternative, he requested that the trial court grant him an easement for ingress and egress, pursuant to what was then Tennessee Code Annotated § 54-14-101 *et seq.* The trial court found that Kenneth Miller was entitled to the third alternative claim he had pled, an implied easement appurtenant by necessity.

As Michael and Tammy Miller point out on appeal, Kenneth Miller's trial counsel stated the following at the close of trial regarding the relief his client was seeking:

> If all of these arguments fail, we still have the last resort as described by TCA-54-14-101 *et seq.*, which is essentially the jury of view appointed a right-of-way through the land to the island. However, this is only applicable when there's a private road in use. That's not the case here. The defendants Miller have openly testified to their agreement of a right-of-way through their land.
>
> So the Court won't even – you needn't resort to that option since there is no denial. In fact, they have proposed a way that they would give access to the island.

We note that Kenneth Miller acknowledged at trial that Michael Miller had never refused him access to the Island Tract, which would have been "the threshold requirement for a condemnation action pursuant to Tennessee Code Annotated Section 54-14-101." *See*

---

[8] The record reflects that Kenneth Miller did not actively pursue the implied easement by estoppel claim at trial.

27

*Vise*, 2015 WL 4273492, at *5. The trial court did not err by declining to follow the statutory procedure for private condemnation.

In determining the location of the easement across the Servient Estate, the trial court compared the two routes requested by the parties: Kenneth Miller's plea for an easement across the front yard versus Michael and Tammy Miller's proposed easement along the perimeter. The trial court found that the cost to Michael and Tammy Miller, as the owners of the Servient Estate, would be "much higher" if the easement crossed the front yard than the cost would be to Kenneth Miller, as the owner of the Island Tract, or dominant estate, if the easement tracked the perimeter. We conclude that the evidence preponderates in favor of this determination.

Our Supreme Court has long held that when the location of an implied easement by necessity is to be set by a court for the first time, it should be according to "the reasonable convenience" of both the dominant estate landowner and the servient estate landowner. *See McMillan v. McKee*, 164 S.W. 1197, 1198 (Tenn. 1914); *City of Whitwell v. White*, 529 S.W.2d 228, 232 (Tenn. Ct. App. 1974) (citing *McMillan*, 164 S.W. at 1198, with approval). As the *McMillan* Court explained:

> Where, as in the present case, there has been no location, and prior travel has been along no particular or definite route, it would seem that the court when called on to locate should defer to the selection of the landowner, if that be reasonable, as it is found to be in fact on the record.
>
> The route when thus fixed by the court is to be determined, however, not by the sole interest of either of the parties, but by the reasonable convenience of both.

*McMillan*, 164 S.W. at 1198.

In this case, Michael and Tammy Miller presented proof that, as the trial court found, the market value of the Servient Estate would be reduced by "tens of thousands of dollars" with an easement crossing the front yard. Ms. Becker testified that she had been retained by Michael and Tammy Miller to list the Servient Estate for sale in April or May of 2018. She reported that Michael and Tammy Miller had entered into a purchase and sales agreement with Conrad and Debra Shigematsu, who had agreed to pay $349,900 to purchase the Servient Estate. Reviewing the purchase and sales agreement, Ms. Becker pointed to a clause stating that the agreement was "contingent upon a proposed easement to be on the rear of the property as outlined in Exhibit A." Exhibit A reflected a proposed easement along the fence of what is now the Latham Property, which is not at issue in this appeal.

When Mr. Shigematsu was questioned at trial regarding this contingency, he stated that he would have to consult with his wife and consider whether they were willing to complete the purchase if an easement ran along the perimeter of the Servient Estate. When asked if he and his wife would be willing to purchase the Servient Estate if the easement crossed the front yard, Mr. Shigematsu unequivocally answered in the negative.

Ms. Becker testified that the potential of a riverfront easement had "turned off many buyers." She stated that "the buyer is paying a premium" for riverfront property but that "the location of the easement is so important because of what it does here at the riverfront of the property." Ms. Becker further testified that an easement through the front yard of the Servient Estate "would have an adverse effect on the property value," on which she acknowledged she could not "put an exact dollar amount."

As the trial court found, Michael Miller's testimony that he and his wife had spent approximately $140,000 repairing and refurbishing the Servient Estate was uncontroverted. Likewise, their testimonies were uncontroverted that they had paid over $33,000 to Kenneth and Mary June Miller upon an agreement that they would pay $25,000 for the Servient Estate. Each of them respectively described a great deal of work that they had personally done refurbishing the Servient Estate.

The trial court expressly found Michael and Tammy Miller to be credible witnesses. In response to the trial court's questioning regarding the easement he had proposed, Michael Miller stated that the area along the back of the Servient Estate was "flat" and "just grass" with "a couple of pecan[] [trees] . . . on the property line." Regarding the width of the proposed easement, the following exchange occurred:

| | |
|---|---|
| Trial Court: | [Kenneth Miller is] going to have to come . . . |
| Michael Miller: | He'd just come around here and do a turn around it. |
| Michael Miller's Counsel: | And you're willing to give the extra whatever it takes to get around that? |
| Michael Miller: | Yeah. |
| Trial Court: | Circle around it. |
| Michael Miller: | And over here, I told [his counsel] we'd do six – a six feet off of the property line here, and do six |

29

|                  |                                                                                                                                                                                                                                 |
|------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                  | feet off, a 12-feet easement to get down to the bridge.  An offset, a 6-foot offset right here.                                                                 |
| Trial Court:     | What's your thought, why is there six foot?                                                                                                                     |
| Michael Miller:  | Well, because when you get down here to the water, you need – you need at least a 6-foot off-lay from off the water here for it to be safe and to make the turn.  I've used my car, I've driven my car all the way down through here just as a trial run to make sure that it would work. |
| Trial Court:     | Okay.  That's the Snyder . . .                                                                                                                                  |
| Michael Miller:  | That's the Snyder driveway, which our property line runs right here and then it ingresses a little bit over onto their driveway and it ends up right here.  There's property stakes at both ends. |

When questioned regarding how much it would cost to construct a road over the easement he was proposing, Michael Miller estimated approximately $5,000, explaining: "I paid $840 to have that brown Nolichucky pebble stone put down.  And I have that put down ever couple of years."  In estimating the financial burden on Kenneth Miller of locating the easement around the perimeter of the Servient Estate, the trial court found that "[t]o have similar type of access to what he has now," it would cost "[a]t most . . . $5,000; and that's if he decides to put some gravel down."  The trial court emphasized that Kenneth Miller had not maintained a road over his claimed easement in noting that he would not be losing the investment that such an established road would have represented.  Mr. Blankenship and Mr. Bush corroborated Michael Miller's testimony that the easement as he proposed it did not present topographical impediments.

Kenneth Miller asserts that the easement as granted by the trial court is "inadequate and improperly inconvenient."  He also asserts that in setting the width of the easement, the trial court based its decision on a "feeling" rather than the purposes the easement would serve.  To the contrary, we note that the trial court made specific findings regarding the activities that typically occurred on the Island Tract, which the court found to be primarily recreational in nature.  Kenneth Miller also argues that logging trucks would need a wider easement than twelve feet.  Although the trial court credited Kenneth Miller's testimony that the Island Tract had been logged at least three times over the years, as well as Mr. Stout's testimony that he had logged once in 2003, no evidence was offered regarding any ongoing logging operation on the Island Tract.  For the primarily recreational purposes

found by the trial court, we do not find the twelve-foot width to be unreasonable. *See, e.g.*, *City of Whitwell*, 529 S.W.2d at 234 (affirming the trial court's grant of a fifteen-foot implied easement by necessity upon determining in part that "it cannot be said that the 15-foot width is unreasonable."). Considering the totality of the evidence and the respective burdens on each landowner, we determine that the trial court's placement of the easement across the perimeter of the Servient Estate met the reasonable needs of the parties. *See id.* ("The extent of a way of necessity is limited only by the reasonable needs in contemplation of the parties at the time of the deed from which the way resulted.").

In ultimately setting the metes and bounds of the easement granted, the trial court approved Thomas Snyder's updated survey and a metes and bounds description of the easement, incorporating both into the final judgment. Upon careful review, we determine that the trial court did not err in entering the metes and bounds description of the easement.

## V. Litigation and Lack of Settlement

Kenneth Miller contends that the trial court erred by finding that his pursuit of litigation and lack of settlement constituted a determinative equity. He argues that in deciding that it was most equitable to locate the implied easement by necessity around the perimeter of the Servient Estate rather than through the front yard, the trial court improperly weighed his pursuit of litigation against Michael and Tammy Miller in the previous and instant actions and his refusal to accept Michael and Tammy Miller's offer of judgment in this action as dispositive. Michael and Tammy Miller argue that although the trial court made a "short, incidental" comment in its memorandum opinion and order concerning Kenneth Miller's pursuit of litigation and refusal of the offer of judgment, the trial court carefully weighed the reasonableness of the location's easement based on the totality of the evidence. Upon thorough review, we conclude that to the extent the trial court considered Kenneth Miller's actions in this regard, such consideration constituted harmless error because the trial court ultimately based its location of the easement on Kenneth Miller's reasonable necessity of access and the relative costs of the easement to the value of the Island Tract and the Servient Estate.

In the argument section for this issue in his principal brief, Kenneth Miller takes issue with the trial court's having failed to exclude Pamela Miller's testimony from the evidence upon the court's finding that she was not a credible witness. He then asserts that the trial court relied in part on the discreditation of Pamela Miller's testimony to decide the location of the easement. We note that this issue concerning Pamela Miller's testimony and its lack of exclusion is not the issue presented in the statement of the issues. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."). We therefore find any issue concerning Pamela Miller's testimony to be waived. *See Forbess v. Forbess*, 370 S.W.3d 347, 356 (Tenn. Ct. App. 2011) ("We may consider

an issue waived where it is argued in the brief but not designated as an issue."). Moreover, Kenneth Miller presents no authority, and our research has revealed none, that requires the trial court to officially exclude or have stricken from the record a witness's testimony that the court ultimately finds not to be credible.

On appeal, Kenneth Miller asserts that the trial court discounted "an abundance of similar proof from other witnesses as to the location of access to the island tract." We disagree. The trial court found that Pamela Miller was the witness who "seemed to have the most facts that she provided the Court on the location, what they assert is the drive from the front of the [Servient Estate], using their driveway past where the old barn was and basically 120, 180 feet straight shot towards the bridge." As the court noted, Pamela Miller "provided a lot of detail" concerning the specific location of what she insisted had been the route always used to access the Island Tract. As summarized more fully in an earlier section of this opinion, other witnesses did not and were for the most part more ambiguous in their descriptions of how people had historically accessed the Island Tract. Having determined Pamela Miller's testimony not to be credible, the trial court properly considered the testimonies of other witnesses in finding that Kenneth Miller had failed to establish that an implied easement by prior use existed across the particular right of way he claimed through the front yard of the Servient Estate. We emphasize again that "[w]hen credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *See Morrison*, 338 S.W.3d at 426.

In support of his argument that the trial court erred by considering his unwillingness to settle the case, Kenneth Miller relies on Tennessee Rule of Evidence 408, which provides in pertinent part:

> Evidence of (1) furnishing or offering to furnish or (2) accepting or offering to accept a valuable consideration in compromising or attempting to compromise a claim, whether in the present litigation or related litigation, which claim was disputed or was reasonably expected to be disputed as to either validity or amount, is not admissible to prove liability for or invalidity of a civil claim or its amount or a criminal charge or its punishment.

As Michael and Tammy Miller point out, their trial counsel during his opening statement essentially repeated the offer of judgment that they had filed prior to trial, stating that they were "willing to permit [Kenneth] Miller to have an easement across the back of their property line." Kenneth Miller's counsel did not object. The offer of judgment, although filed with the trial court, was at no time offered into evidence during trial.

32

In its memorandum opinion, the trial court noted what it found to be the "origin" of the instant action. Several of the Miller family members testified during trial that an altercation had occurred during a family gathering on the Servient Estate between Michael Miller and Pamela Miller's longtime paramour, Kevin Stafford. The trial court summarized its findings concerning this altercation and its effect on the initiation of the lawsuit as follows:

> July 4th, 2015, there was a family gathering and this was the origin of where we are today. Pam Miller has a boyfriend. He did not testify. His name is Kevin Stafford. Michael Miller asked him to extend the courtesy of walking and recognizing, if the property was wet, to be careful.
>
> For whatever reason, either by personality or inducement by over-consumption of alcohol that day, Kevin Stafford confronted a polite request from Michael Miller, and he went redneck that day. He goes out, he stirs up his girlfriend, Michael's sister Pam, who, from my observation in the courtroom, his sisters, too, they are easily agitated. She gets up in an uproar. He comes back and decides to do doughnuts in the back of the yard, unjustified, being ridiculous. Pam rallied sisters and father against Michael and she's been doing that ever since.
>
> Unfortunately, [Kenneth Miller], either by personality, does not seem like the same person that heard testimony about, who was a Sunday school teacher, upstanding citizen in the community, well regarded. Either by the loss of his wife or by the failings of his health, he was susceptible to manipulation by his daughters such that he took opposition against his son.
>
> They sued, even though [Michael and Tammy Miller had] been there for six years, in February 2016 to try to take away the house and land of their brother and son and everything that he had done there. That did not work. Now, instead of talking to Michael and Tammy Miller about an easement, they filed their second lawsuit against a relative with no notice, no attempt to resolve it. Kenneth Miller needed an easement. He owns the island. He has elected to ask this Court to grant him one [rather] than his son and daughter-in-law.

In subsequently considering where "the equities" lay in determining where the easement should be placed, the trial court stated in part: "[T]he equities are not with Kenneth Miller. With litigation, he has tormented his son and daughter-in-law. He has not attempted to work this out among the family." Kenneth Miller correctly points out that litigiousness is not one of the maxims included in "The Twelve Tables of Equity." *See*

33

GIBSON'S SUITS IN CHANCERY § 17 (William H. Inman ed., 6th ed. 1982). However, contrary to Kenneth Miller's assertion, we do not find this consideration made by the trial court to have been a "determinative equity" in the trial court's placement of the easement.

The trial court proceeded to weigh the cost in loss of value to the Servient Estate of placing the easement through the front yard against the cost to the Island Tract, or dominant estate, owner of establishing an easement around the perimeter of the Servient Estate. Having determined in an earlier section of this opinion that the evidence preponderated in favor of the trial court's location of the implied easement by necessity, we further determine that any tangential consideration by the trial court of Kenneth Miller's pursuit of litigation and unwillingness to accept Michael and Tammy Miller's offer of judgment constituted harmless error. Kenneth Miller is not entitled to relief on this issue.

## VI. Grant of Easement across Snyder Tract

Lili Snyder contends that the trial court erred by granting relief against her that was not pled in the complaint. In its final judgment, the trial court entered default judgment against Lili Snyder, granting to Kenneth Miller an implied easement by necessity of twelve feet in width across the back of the Snyder Tract as it lay between the Kenneth Miller Tracts and the Servient Estate. In response, Michael and Tammy Miller argue in part that when Kenneth Miller pled an implied easement by necessity as one alternative for relief in the complaint against all defendants, including Lili Snyder, all defendants were put on notice that the trial court, if it found an implied easement by necessity but not by prior use, could determine the location of the easement. In its memorandum opinion incorporated into the order denying Lili Snyder's post-trial motions, the trial court stated the following concerning this point:

> Lili Snyder complains of the location of the easement set out by the Court. But the cause of action itself does not require the Court to place an easement, if there is one by a necessity, at the exact location requested by [Kenneth Miller]. And, of course, in the complaint [Kenneth Miller] requested just access in addition over the defendants, which is plural to include Ms. Snyder.

We agree with the trial court and Michael and Tammy Miller on this point. *See Ingram*, 379 S.W.3d at 240 (noting that placement of an easement created by necessity "may allow for a route of access where one previously did not exist"). Lili Snyder's argument in this regard is based on the assumption that the trial court would find an implied easement by prior use across the particular area that Kenneth Miller claimed, but Kenneth Miller also requested the alternative relief of an implied easement by necessity. We therefore determine that the relief granted to Kenneth Miller against Lili Snyder was pled in Kenneth Miller's complaint.

Our analysis of this issue cannot stop there, however. The essence of Lili Snyder's argument concerning this issue is that the trial court erred by denying her motion to set aside the default judgment granting an easement across the back of the Snyder Tract, which she filed pursuant to Tennessee Rules of Civil Procedure 55.02 and 60.02. As this Court has previously explained concerning default judgments:

> A default judgment, while a necessary part of a trial court's repertoire, is a big stick that should not be wielded haphazardly. Default judgments should be granted only when a defendant (1) makes no appearance in the case, in spite of being properly served, (2) appears, but fails to respond to the complaint, or (3) disobeys a pretrial order directing defendant to comply with some procedural requirement.

*First Union Nat'l Bank of Tenn. v. Abercrombie*, No. M2001-01379-COA-R3-CV, 2003 WL 22251347, at *3 (Tenn. Ct. App. Oct. 2, 2003) (internal citations omitted).

Pursuant to Tennessee Rule of Civil Procedure 55.02, default judgments may be set aside "[f]or good cause shown" and "in accordance with Rule 60.02." Tennessee Rule of Civil Procedure 60.02 provides in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.

Despite the reference to Rule 60.02 contained within Rule 55.02, this Court has noted that "[a] party against whom a default judgment has been entered may seek relief from that judgment by filing a motion to alter or amend the judgment under Tenn. R. Civ. P. 59 or a motion for relief from judgment under Rule 60." *See Estate of Vanleer v. Harakas*, No. M2001-00687-COA-R3-CV, 2002 WL 32332191, at *4 (Tenn. Ct. App. Dec. 5, 2002) (footnote omitted).

The party who seeks to set aside the default judgment has the burden of demonstrating that he or she is entitled to relief. *See Purdy v. Smith*, No. M2012-02463-COA-R3-CV, 2014 WL 2194451, at *3 (Tenn. Ct. App. May 23, 2014). Relief from a default judgment is typically sought due to allegations of "mistake, inadvertence, surprise or excusable neglect." *See, e.g., Discover Bank v. Morgan*, 363 S.W.3d 479, 491-92 (Tenn. 2012); *Patterson*, 328 S.W.3d at 511. In that context, regardless of whether relief from a default judgment is sought under Rule 54, 59, or 60, the trial court must determine "(1) whether the default was willful; (2) whether the defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted." *See Discover Bank*, 363 S.W.3d at 492 (quoting *Tenn. Dep't of Human Servs. v. Barbee*, 689 S.W.2d 863, 866 (Tenn. 1985)). The primary consideration, however, is whether the defaulting party's conduct was willful. *See Discover Bank*, 363 S.W.3d at 492-93.

In its memorandum opinion concerning the post-trial motions, the trial court stated the following in relevant part:

> [Lili Snyder] never answered. She has offered no excuse why she . . . failed to answer. She didn't come to the trial. There's been no allegation of mistake, inadvertence, surprise, or excusable neglect or fraud.
>
> Understand this is a case where it's all relatives suing relatives and maybe she was of the belief, just speculation on my part, that [Kenneth Miller] would take care of her in the lawsuit. That's not asserted, but one could speculate that's what she was thinking. But that would be speculation on my part; I can't rely on that.
>
> The motion for . . . offers of judgment . . . specifically set out an easement going across [Lili Snyder's] property. Yet, even after she received that, she took no action to at least appear and file something before the trial or to even come to the trial and see what happens. For these reasons the motion is respectfully denied.

On appeal, Lili Snyder argues for the first time that the judgment entered against her should be set aside for failure to comply with the notice requirement of Tennessee Rule of Civil Procedure 55.01, which provides in pertinent part:

> When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, judgment by default may be entered as follows:

The party entitled to a judgment by default shall apply to the court. Except for cases where service was properly made by publication, all parties against whom a default judgment is sought shall be served with a written notice of the application at least five days before the hearing on the application, regardless of whether the party has made an appearance in the action.

Despite Lili Snyder's failure to raise this issue before the trial court, we will address it because a default judgment entered without proof of proper notice may be considered void depending upon "the proof of service presented when default judgment [was] requested." *See Frierson v. Johnson*, No. M2006-02598-COA-R3-CV, 2008 WL 555721, at *6 (Tenn. Ct. App. Feb. 28, 2008) (quoting *Estate of Vanleer v. Harakas*, No. M2001-00687-COA-R3-CV, 2002 WL 32332191, at *6 n.7 (Tenn. Ct. App. Dec. 5, 2002)).

Under the circumstances of this case, we determine the notice requirement of Rule 55.01 to be inapplicable. In this action, Kenneth Miller did not seek a default judgment against Lili Snyder. Instead, the trial court conducted a full bench trial for which Lili Snyder undisputedly received notice. As this Court explained in a case involving a comparable situation:

Finally, it is argued that the judgment was entered in contravention of T.R.C.P., Rule 55.01, which requires a written notice of application for judgment at least five days prior to the hearing on such applications where a party has appeared in the action. The judgment entered here is not a default judgment within the requirements of T.R.C.P., Rule 55.01. The case was regularly docketed for trial on the date the judgment was entered with notice in excess of 90 days to all parties. While defendant Delozier had not answered, the motion for default in his case apparently was still pending. However, the plaintiff, by going to trial without timely pursuing a default judgment as to this defendant prior to trial, waived the right to rely upon Delozier's failure to answer as a basis for judgment. *See Edwards v. Edwards,* 501 S.W.2d 283 (Tenn. App. 1973). The record establishes the judgment was based on evidence presented at trial.

*Barber & McMurry, Inc. v. Top-Flite Dev. Corp.*, 720 S.W.2d 469, 471-72 (Tenn. Ct. App. 1986); *see also In re Yariel S.*, No. E2016-00937-COA-R3-PT, 2017 WL 65469, at *5 (Tenn. Ct. App. Jan. 6, 2017) (concluding that "compliance with Rule 55.01 was not required" when "the trial court issued its judgment based upon the evidence presented at trial, despite [the respondent's] failure to appear after having received notice of the hearing").

The Rule 55.01 notice requirements provide protection from entry of a judgment against a defendant without any hearing on the merits. *See Fillers v. Collins*, No. E2013-01210-COA-R3-CV, 2014 WL 631239, at *4 (Tenn. Ct. App. Feb. 18, 2014) ("When a defendant fails to answer a complaint, the plaintiff may obtain a default judgment without a hearing on the merits." (quoting *Henry v. Goins*, 104 S.W.3d 475 481 (Tenn. 2003))). In this case, the trial court conducted a full bench trial on the merits in which Lili Snyder willfully chose not to participate. We do not find the notice requirements of Rule 55.01 to be applicable in this situation.

This brings us to Lili Snyder's original argument that the default judgment should be set aside because her failure to answer or appear constituted inadvertence or excusable neglect. She asserted in her motion, *inter alia*, that "she mistakenly believed that her interests were similar to and would be adequately protected by the other named defendants" and that "she did not anticipate that her property rights would be affected or that a new easement would be created or moved across her property." Lili Snyder does not contest the trial court's finding that she was properly served with copies of all pleadings in this matter. We note that Michael and Tammy Miller never purported to speak for Lili Snyder during these proceedings. Instead, they took pains to establish that they could not do so, stating in their answer to the complaint that they could "neither admit nor deny the intentions of Lili Snyder."

Moreover, by asserting that she purposefully chose not to participate in the trial because she did not know that a new easement could be placed across her property if the trial court found an implied easement by necessity, Lili Snyder essentially admits that her failure to participate was willful. Such willful failure to participate cannot be set aside on grounds of excusable neglect. *See Discover Bank*, 363 S.W.3d at 494 ("If the court finds that the defaulting party has acted willfully, the judgment cannot be set aside on 'excusable neglect' grounds, and the court need not consider the other factors.") (footnote omitted). The trial court did not abuse its discretion by denying Lili Snyder's motion to set aside the judgment entered against her.

## VII. Family Burial Grounds Protection Act

In its final judgment, the trial court directed that the easement across the Snyder Tract would be placed to "keep at least four [feet] off of the burial spot" of Mary June Miller. On appeal, Lili Snyder contends that the trial court's judgment should be modified because the trial court erred in locating the easement by failing to follow the standards of the Family Burial Grounds Protection Act ("Burial Grounds Act"), which provides in pertinent part:

(a) A deed for real property that indicates the presence of a gravesite or crypt containing human remains on the property conveyed obligates the immediate and future buyer or buyers of the property to protect the gravesite or crypt from disturbance. The owner of real property has the responsibility for taking appropriate action, prior to conveying the property, to ensure that the deed reflects the presence of the gravesite or crypt on the property.

(b) Real property that has a deed that reflects the presence of human remains on the property is protected from disturbance or development as follows:

(1) A gravesite may not be disturbed in the area of ten feet (10′) surrounding the perimeter of the gravesite; and

(2) A crypt may not be disturbed in the area of five feet (5′) surrounding the perimeter of the crypt.

Tenn. Code Ann. § 46-8-103 (Supp. 2019).

Citing the plain language of the statute, Michael and Tammy Miller assert that the statute does not apply to this action because none of the deeds presented in the chain of title to the Snyder Tract or to the Servient Estate indicate the presence of a gravesite containing human remains. Lili Snyder concedes this point, but she asks this Court to look beyond the plain language of the statute to interpret the intent of the General Assembly as providing notice to future landowners that existing family burial grounds need protection. While noting that "[w]hen a statute is clear, we apply the plain meaning without complicating the task," *see In re Estate of Tanner*, 295 S.W.3d 610, 614 (Tenn. 2009), we decline to consider Lili Snyder's argument in this regard because she failed to raise it in any pleading before the trial court.

Compliance with the Burial Grounds Act was not raised by any party to this matter until Lili Snyder's counsel mentioned it to the trial court during oral argument on Lili Snyder's post-trial motions. Lili Snyder did not raise an issue concerning the Burial Grounds Act in either her motion to set aside the default judgment or her motion to alter or amend the judgment. During the hearing on the motions, Lili Snyder's newly retained counsel mentioned compliance with the Burial Grounds Act as "one other matter" and stated she believed that Kenneth Miller's former counsel "had called [it] to the family's attention." Whether Kenneth Miller's former counsel may have mentioned the Burial Grounds Act to his client and his client's family, however, does not change the fact that the Burial Grounds Act was never mentioned in any pleading before the trial court or in

39

this record at all until the post-trial hearing. We determine that this issue was not properly raised before the trial court and is therefore waived on appeal. *See Waters v. Farr*, 291 S.W.3d 873, 918 (Tenn. 2009) (stating that issues not raised in the trial court are waived on appeal).[9]

## VIII. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court. We remand this case for enforcement of the judgment and collection of costs below. Costs on appeal are taxed to the appellant, Kenneth C. Miller.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[9] Neither the appellants' principal brief nor their reply brief offer any clarification as to which appellant is raising this issue. Inasmuch as the gravesite at issue is on the Snyder Tract and the only mention of the Burial Grounds Act was during the hearing on Lili Snyder's post-trial motions, we have attributed this argument to Lili Snyder.

